BIBELHAUSEN, Respondent, vs. BIBELHAUSEN, Executor, and others, Appellants.

*December 10, 1914—January 12, 1915.*

*Husband and wife: Property rights: Antenuptial agreements: Validity: Public policy: Fraud: Burden and degree of proof: Consideration: Payment: Evidence: Presumptions: Statutes construed: Election by widow: Summons: Order for publication.*

1. The fact that there were mutual promises of marriage preceding an antenuptial agreement as to property matters does not constitute a badge of fraud; much less is it, in itself, a ground for declaring the contract void as against public policy.
2. An antenuptial agreement whereby dower and other rights are released by the prospective wife must be free from fraud or imposition and will be regarded with rigid scrutiny, but the burden of proof is upon the party alleging fraud and it must be established by clear and satisfactory evidence.
3. Facts which might establish fraud in an antenuptial agreement between a young and inexperienced woman and a man of superior business acumen may be given much less weight where the parties were advanced in years, had been married before, and the second marriage was largely a business arrangement to secure a home.
4. If the minds of the parties met as to such agreement and they executed it understandingly, the mere fact that it was not as fair as it would seem to the court it ought to have been gives no warrant for disturbing it.
5. The right to make an antenuptial agreement settling property matters by treaty existed before the statute (secs. 2167–2171, Stats.) and was not taken away thereby.    Such an agreement

should not be confused with the legal jointure provided for in sec. 2167.

6. Sec. 2169, Stats., providing for the barring of dower by "any pecuniary provision which shall be made for the benefit of an intended wife," does not make it essential to the validity of an antenuptial contract that there be an adequate provision for support of the wife after the husband's death.  Anything of value given as a provision satisfies the technical requirement.

7. An antenuptial agreement, executed by the intended wife only, by which, for a sufficient consideration paid or to be paid, she releases all future claims upon her intended husband's property or estate, including dower right, is not subject to an election by her not to be bound thereby.  Sec. 2170, Stats., contemplates a conveyance made by the intended husband and not assented to by the intended wife, and is therefore inapplicable; as are also sec. 2172 and sub. 2, sec. 2172a, fixing the time for election.

8. In such an agreement the mention of the consideration and the formal acknowledgment of receipt thereof are mere recitals, not contractual in character, which may be explained or varied, but not so as to vary or defeat the instrument for the purpose for which it was given.

9. Even if the pecuniary consideration named in such an agreement was not actually paid at the time the agreement was made or thereafter during the lifetime of the husband, that fact does not, in itself, render the agreement void or affect it in any way as a surrender of marital rights in his property.  The instrument, under such circumstances, will be construed as containing an implied promise to pay, which may be enforced.

10. Although in such case the widow might be precluded, under sec. 4069, Stats., from testifying as to the facts respecting payment of the consideration, no presumption of fraud should on that account be indulged in to avoid the agreement; but, in the absence of evidence to the contrary, the presumption should be that there was some understanding in respect to the matter consistent with the recital, as that the money to be paid was retained by the deceased for the wife at her request and as her trustee, possession by her to wait upon some future event which could not be postponed later than the *post-mortem* distribution of his estate.

11. In any event the rights of the widow in such a case become fixed at the time of the husband's death.

12. An order for publication of the summons in a divorce action, directing it to be published "for not less than once a week for six weeks," fixes the period of publication at six weeks, and is a sufficient compliance with sec. 2640, Stats.

13. Although marriage itself is, under some circumstances, a sufficient consideration for a release by the intended wife of marital rights in the future husband's property, an efficient presumption of fraud may arise from a grossly inadequate or manifestly unfair pecuniary consideration for such release.

14. Circumstances bearing upon the question whether the pecuniary consideration for such a release is so grossly unfair as to give rise to a presumption of fraud include the age of the parties, their position in life, the reasonable expectations of a pecuniary nature surrendered, based not only on present possessions but also on the ability of the intended husband to acquire property, the needs of the intended wife, and the extent to which companionship and home life were the real inducement to the marriage without thought of property advantages.

15. Subsequent conduct of the husband may also be considered,—such as, in this case, the making of generous provision for the widow in his will by way of annuity and otherwise.

16. Testimony of one who signed an antenuptial agreement releasing her marital rights in the property of her intended husband, that when she signed the instrument she did not know what was in it, is of little weight in face of the presumption to the contrary, an entire absence of proof that any artifice was used to prevent her knowing the contents and clear testimony that the paper was explained to her before she signed, and the fact that she made no complaint about it until after her husband's death some eleven years later.

17. The fact that an antenuptial agreement, whereby the intended wife released marital rights in the property of the intended husband, in terms precluded her from making any claim upon his estate in the event of a separation after marriage, as well as in case of his death, did not render the release void as against public policy. [Whether the agreement would be binding on the wife in case of a separation, not decided.]

18. The right to make antenuptial agreements settling property matters in advance, while it should be carefully guarded against abuse, is a valuable personal right which should not be interfered with or regulated destructively, nor its exercise looked upon with disfavor.

APPEAL from a judgment of the circuit court for Shawano county: JOHN GOODLAND, Circuit Judge. *Reversed.*

Action impeaching the validity, on the ground of fraud, of an antenuptial agreement, and to have it and the record thereof canceled.

The court found these to be the facts, in general effect: September 2, 1901, plaintiff and Joseph Bibelhausen, now deceased, without any preliminary arrangements as to property, mutually agreed to become man and wife. September 11th, thereafter, they visited the city of Milwaukee for the purpose of having their marriage ceremony performed. They went to the office of an attorney where plaintiff was procured to sign the paper sought to be avoided. It was in due form of an antenuptial contract and release by the plaintiff of all future claims upon her intended husband's property or estate, including dower right, in consideration of marriage and $500. The receipt of the money was acknowledged. The release was very comprehensive, precluding, if valid, plaintiff from making any claim of any character upon the estate of her intended husband, either in case of his death or the parties otherwise separating. Execution of the paper was witnessed and acknowledged so as to entitle it to be recorded in the office of the register of deeds.

After execution and delivery of the paper the parties were married. Plaintiff confided implicitly in her intended husband. She was a woman of but little business experience. She owned a house and forty acres of land and some personal property worth some $800. Shortly after the marriage such property was conveyed to Mr. Bibelhausen who, later, sold the same and had the benefit of the proceeds. On the day of the execution of the agreement, Mr. Bibelhausen, in the absence of his intended wife, caused the instrument to be prepared ready for signature. The pecuniary consideration in it was never paid. Plaintiff did not see the instrument, after its execution, during the lifetime of Mr. Bibelhausen. He kept it, though, about the time he made his will, he caused it to be recorded in the office of the register of deeds of the county where the parties resided. No provision of any kind was made by him for plaintiff, outside of such agreement, prior or subsequent to the marriage, except by will. The in-

strument contained no promise on his part and was not signed by him. It was an agreement on her part, in consideration of marriage and $500, acknowledged to have been paid, to make no claim upon Mr. Bibelhausen's property or estate in case of his death or the parties otherwise ceasing to be husband and wife or ceasing to live together as such, and renouncing all property rights which she might, in the absence of the renouncement, acquire by the marriage which was in contemplation. He died testate November 23, 1912. His will was dated December 31, 1910. The parties lived together as man and wife, continuously, from their marriage until the death occurred. The will was duly admitted to probate. It disposed of real and personal property of approximately $13,000. He left surviving, besides plaintiff, a son and two grandchildren. Their relationship to him was through a former marriage. He made these provisions for plaintiff, including the general direction for precedent payment of his debts not excepting any existing in her favor under the antenuptial agreement: "All the household furniture, goods and effects of every kind and nature absolutely" and $15 per month for life. The use of the homestead, describing the realty and the buildings thereon, to be free from all taxes, general and special, and insurance. Prior to the death of Mr. Bibelhausen, he sold the property so willed to plaintiff for a home and removed to another place which passed by the will, but not to plaintiff. The statutory time for election not to take otherwise than under the statute has not expired. Mr. Bibelhausen possessed some property at the time of the marriage.

On such facts the conclusion was reached that the agreement was contrary to public policy and void.

The trial judge filed an opinion and, as seen, probably, by the cast of the findings, allowed counsel for the prevailing party to prepare them. In the opinion doubt is expressed as to what to call the agreement; and it is said that, in substance, Mr. Bibelhausen purchased in advance his freedom from

plaintiff as to property rights, in form, for $500, which he omitted to pay; that the marriage, under the circumstances, became a matter of bargain and sale, rendering the agreement void as against public policy, though there may not have been any actual fraud or deception; that plaintiff either did not consent to the arrangement, stated in the instrument signed by her, or her consent was obtained under such circumstances as to render it nugatory; and that there was, in reality, no such antenuptial pecuniary provision as is contemplated by sec. 2169, Stats.

The following not covered significantly, if at all, by the findings, appears by the evidence: Both parties were past the meridian of life when the marriage took place. Each had been previously married and been divorced. He was fifty-three years of age and had a son twenty-four years old. She was forty-nine years of age and the mother of five children, three being of full age and the others seventeen and fifteen years of age respectively. The parties were in substantially the same station in life. They were quite equal in intelligence and freedom from dependence upon entering into marriage relations. There was no effort on the part of Mr. Bibelhausen to obtain the signature of plaintiff to the contract against her will. When she visited the lawyer's office to sign it she knew the purpose of the visit. The lawyer who drafted the paper was a reputable member of the legal profession and did nothing to induce plaintiff to execute the paper. He read it to her, she was made, as he supposed, to know what it meant, and signed it without coercion, but with the understanding that it was essential in order to have the contemplated marriage take place.

For the appellants there was a brief signed by *Eberlein & Eberlein,* attorneys, and *H. O. Buth,* guardian *ad litem* for *Esther C. Bibelhausen* and *Roy J. Bibelhausen,* and oral argument by *Albert S. Larson.*

*P. J. Winter & E. V. Werner,* for the respondent.

• MARSHALL, J. It is somewhat difficult to discover the exact logic of the court's conclusions. It is claimed, and not denied, that the findings were prepared by counsel for the prevailing party. There is evidence of that in the amount of unnecessary matter contained therein and a somewhat nonjudicial form of expression which, to my mind, takes very largely from the respect which findings of fact, judicially and judiciously prepared, are entitled to have. If counsel are permitted to draw the findings and choose the language with which to clothe a judicial determination, I suggest that the most careful attention should be devoted to the work to avoid giving the result a partisan and nonjudicial cast.

The learned court characterized the agreement as making the marriage state a matter of bargain and sale, as if the antenuptial contract were void as matter of public policy, or at least, to be avoided if practicable, rather than sustained. The fact that there were mutual promises of marriage preceding an arrangement as to property matters, was given special significance. That is commonly the case. It does not constitute, even a badge of fraud, much less, in itself, ground for declaring a contract void as contrary to public policy.

While it is true that the circumstances characterizing the making of an antenuptial contract, where there is anything suggesting unfairness in the property provision, are to be scrutinized with care and the agreement held void if it was not freely and understandingly entered into, to challenge validity is to allege fraud and that the instrument was the result thereof. In such a case the burden to establish fraud is on the party alleging it, and such burden can only be efficiently lifted by clear and satisfactory evidence. The mutual intentions of the parties, in such circumstances, are just as binding as is any other agreement. There is nothing inherently suspicious or bad about such an agreement. The contrary logic in the findings is wrong as decidedly shown by the decisions of this court. *West v. Walker,* 77 Wis. 557, 46 N. W. 819; *Deller v. Deller,*

141 Wis. 255, 124 N. W. 278; *Oesau v. Estate of Oesau,* 157
Wis. 255, 147 N. W. 62.

True, an agreement whereby the future wife releases her
claim to her right of dower and other rights in the estate of
her future husband, must be free from fraud or imposition,
and is to be regarded with rigid scrutiny, and will not be ap-
proved where it appears that the future wife was overreached
or induced by false representations to make the contract. But
deception and false representations are not to be presumed
and found without evidence. Such characteristics must be
affirmatively established and clearly so. The presumptions
are rather against such reprehensible conduct than the con-
trary, though they may be circumstantially so established.
Events which would so establish such elements in case of a
young and unexperienced person on the one side and a per-
son of superior business acumen on the other, or where the
inducement to marriage on the woman's side was largely
financial and companionship in the marriage relation with the
home life were secondary, might overcome the *prima facie* ef-
fect of the executed contract, would not when the advantage
of the latter being the main thing, as in case of a person cir-
cumstanced as the parties were in this case.

As said in *Oesau v. Estate of Oesau,* the overshadowing
thing in dealing with such a contract as the one before us, is
the intent of the parties at the time of making,—whether
their minds met in respect to what was embodied in the paper,
and they executed it understandingly. If such were the case,
the mere fact that the agreement was not as fair as it would
seem to the court it ought to have been, gives no warrant for
disturbing it.

Parties have the same right to make such a contract as the
one in question as to make any other. It is just as much
within the protection of the fundamental law as any other,
where there is no statutory disability. There is no interfer-
ing unwritten law nor public policy of written law here, con-

demning it.   On the contrary, the statute recognizes the right
to make such, and merely regulates exercise of the right for
purposes of conservation and fairness.   Sec. 2169, Stats.
Decisions made here and there casting discredit on efforts of
the kind, do not voice the prevailing judicial sentiment, nor
that of this court.   In *Oesau v. Estate of Oesau, supra,* the
court said:

"There is nothing inherently suspicious about antenuptial
contracts.   They are, in the absence of unfair characterizing
circumstances, to be regarded with favor rather than disfavor.
In general, the burden is upon the one impeaching such a
contract to support the claim of invalidity rather than upon
the adversary to support the contrary.   If there is anything
about such an instrument, considering all the circumstances,.
indicating that the intended wife had been unduly influenced
to make it, that will overcome its *prima facie* validity, so as.
to require the person asserting the contrary to, at least, re-
store such character."

That expression was based on principle and authority, as
the following illustrations of many which might be given,.
will abundantly show:

In *Kennedy v. Kennedy,* 150 Ind. 636, 50 N. E. 756, the
contention was made, as here, that the contract was void be-
cause not answering to the technical requirements of a joint-
ure under the statute requiring conveyance to an intended
wife of real estate, to take as purchaser for *postmortem* en-
joyment.   The statute was similar to ours.   The court re-
sponded, in terms or effect, to the claim that the instrument
did not satisfy the statute:

"The case . . . is not one of a settlement or jointure under
the statute, but is simply an antenuptial contract. . . . The
right of an adult intended husband and wife in contemplation
of marriage, to intercept a statutory line of descent, or the
rights conferred by law, and substitute by contract, or agree-
ment, a rule of inheritance of their own creation, by which
their respective rights in the property of each other may be
measured or determined, is a well settled principle. . . . In

fact, no principle seems to be more firmly settled at the present time than that an adult woman, before her marriage, may bar her legal rights in her husband's estate by her agreement to accept *any other provisions* in lieu thereof."

Note the language "any other provisions."

"And such an agreement will be upheld and enforced by the courts in the absence of fraud or imposition upon her, and where it may be said, under the particular circumstances, that it is not unconscionable. . . . The rule by which we must be controlled in the interpretation of this contract is that which is applicable to any other contract. . . . It must be considered, not in fragments, but as an entirety, and the intention of the parties ascertained through the words they have used.   To ascertain their intention, regard should be had to the character of the instrument, the condition of the parties, and the object which they had in view."

The same court in *Buffington v. Buffington,* 151 Ind. 200, 51 N. E. 328, said:

"Antenuptial contracts are not in such disfavor as to require rigid construction.   On the contrary, they are favored by the law as promoting domestic happiness and adjusting property questions which would otherwise often be the source of fruitful litigation."

No formality is required, and the purpose of construction is to ascertain and give effect to the intention of the parties.

The same sentiment was expressed by Judge ELLIOTT in *McNutt v. McNutt,* 116 Ind. 545, 19 N. E. 115, adding:

"The truth is, it is exceedingly difficult to imagine why, in any case where there is no fraud, courts should displace the judgment of contracting parties and substitute their own.   No persons in the world can so well and so justly judge as the contracting parties themselves, and it is only in the strongest and clearest cases that courts should disregard their judgment, and never where there is neither positive wrong nor a fraud."

To the same effect are the following, among many at hand: *Barth v. Lines,* 118 Ill. 374; *McGee v. McGee,* 91 Ill. 548; *Weaver v. Weaver,* 109 Ill. 225; *Naill v. Maurer,* 25 Md.

532; *Jenkins v. Holt,* 109 Mass. 261; *Freeland v. Freeland,* 128 Mass. 509; *Andrews v. Andrews,* 8 Conn. 79; 14 Cyc. 939.

The fact that some judicial sayings are contrary to the foregoing does not make the law. It is the prevailing rule, in general, if reasonable, which should be taken as the unwritten law, and must be, when incorporated into our system of jurisprudence by considerate adjudication.

Our statutes, secs. 2167 to 2171, are similar to those in most states. Secs. 2167 and 2169, providing for what is commonly denominated "legal jointure," should not be confused with the right to make a mere antenuptial agreement settling property matters by treaty, before marriage. That right existed before the statute and was not taken away thereby, but rather recognized and encouraged. Failure to appreciate this has made it necessary for many courts to deal with the subject as indicated in the cases cited. This is deduced from the weight of authority in the text of Cyc. cited: "The provisions of a statute that a jointure is a bar of dower do not ordinarily deprive an intended wife of the power to bar her dower by any other form of antenuptial contract." 14 Cyc. 940. That is, of course, provided regulations as to execution are complied with.

There is no reason now, if there were in former times, for judicially creating a disability to settle property matters by antenuptial contract, in view of the common-law disability of women as to business matters having been substantially removed, leaving her as free in that field as if not married. Under our present system of written law, a married woman is given an individuality of her own,—in some respects of greater significance, as to property, than that of her husband. No less freedom of action should be accorded to the woman candidate for marriage.

"The statutes of most of the states now make the wife as free and independent in the control of her property as the

husband is in the control of his property. As a result of this legislation, the tendency of the modern decisions is to uphold antenuptial contracts made fairly and without fraud by adult, single women." *Barth v. Lines,* 118 Ill. 374.

And that is, especially, true where the parties to the contract were advanced in years, had been married before, and the .second marriage was largely a business arrangement to secure a home.

It is suggested that sec. 2169, Stats., which recognizes the right to make an antenuptial contract by using the term which is a mere recital of the common law, "any pecuniary provision which shall be made for the benefit of an intended wife," etc., created a disability to make such a contract without an adequate provision for support of the wife after the decease of the husband. Such has not been the rulings of courts, in general, if at all, under similar statutes. They are to the effect that such statutes do not change the law and only ·contemplate a consideration sufficient to avoid any presumption of fraud from the meagerness or want of it, and to make a substantial basis for the release of marital property rights. Anything which answers to the call for a "provision," is sufficient. *Barth v. Lines, supra; Andrews v. Andrews,* 8 Conn. 79; *Wentworth v. Wentworth,* 69 Me. 247.

Where both parties have property and it is stipulated that each shall retain the individual possession with all rights the same as if unmarried, that is sufficient as held in *Oesau v. Estate of Oesau,* 157 Wis. 255, 147 N. W. 62, and cases heretofore cited. Even if the pecuniary consideration named shall not have been paid, if there is in fact an obligation to pay, that is sufficient. Where there is neither payment nor obligation to pay a different rule might well apply. *Freeland v. Freeland,* 128 Mass. 509.

This court dealt with the subject of "provision" when used in a statute as a condition, in *In re Donges's Estate,* 103 Wis. 497, 79 N. W. 786. Anything of value given as a provision

satisfies the technical requirement. Michigan, Illinois, and many other states, hold—in harmony with courts dealing with the particular class of situations—that any provision which the adult agrees to accept is a "provision." That satisfies all requisites of validity. Whether the provision is so meager or so characterized as to raise an inference of fraud, is another question.

The learned court held that the contract in question was within sec. 2170, making validity of the agreement dependable upon assent to be bound by it having been given after the death of the husband. No reason is perceived for that holding. If plaintiff, without efficient fraud, assented to the agreement—as she *prima facie* did by the fact of her having signed it, she is bound thereby. If she did not so assent, it is void for the fraud. The statute does not deal with such a contract as the one here.

So it seems that the entire logic of the legal conclusions complained of, is very infirm. There is no finding that the making of the instrument was characterized by fraud. The court rather so suggested in the opinion. No misrepresentation as to property or otherwise, was claimed or proved. There was no proof that respondent did not voluntarily make the agreement. The evidence is that the paper was read to her, that she was probably made to understand its contents, and doubtless understood fully its object and agreed to it. Care, *ex industria,* was exercised to see that she was not imposed upon. The attorney, who supervised the matter, testified:

"I prepared the instrument and got them married. I believe Mr. Bibelhausen came here about half-past 8 in the morning alone. He came up there and asked me to prepare this jointure. He gave me the terms. Then she came up with him to sign it. My recollection is that I read it over to her. I am satisfied she knew what she was doing. It is my practice to satisfy myself before taking an acknowledgment that the parties understand and know the contents of

the instrument. I did that in this case. As I remember, the instrument was fully explained and read over to the parties. This is the form we used at the time and have used a number of times since, where the formal consideration is named and where it simply says it has been paid."

He further testified that there was no money paid in his presence; that after the instrument was executed he assisted the parties to obtain a special permit to get married and then accompanied them to the St. Charles Hotel where Judge NEELEN performed the marriage ceremony. There was no other evidence of the circumstances leading up to the making of the paper or characterizing its making, or that any fault was found with it by reason of nonpayment, at the time of its execution or theretofore, of the $500.

During the lifetime of Mr. Bibelhausen respondent made no complaint. The whole course of events suggests, clearly, that she willingly made the paper because she wanted to enter into the marriage relation with Mr. Bibelhausen without any particular reference to prospective property advantages.

Evidently $500 was to be paid as respondent's share of Mr. Bibelhausen's estate. The agreement must be viewed from the aspect of things when it was made. Then the deceased had very little property. If it be valid it constitutes an obligation against the estate. The expression, in form, of present payment, without explanation, is an inadvertency, probably caused by use of a form without inquiring into the circumstances. Evidently, what Mr. Bibelhausen intended to do, was to take a release and preserve his existing right to control and dispose of his property by will or deed as he might see fit, in consideration of $500, either to be paid when his intended wife desired, or out of his estate, and, the agreement having been fully executed, except, possibly, payment of the money, it is not impeachable under our statutes of fraud.

The circuit court misapprehended the law by holding that

the instrument was untainted with fraud, yet merely because of the consideration not having been paid, that it is within sec. 2170, Stats., dealing with jointures properly executed but not assented to by the intended spouse at the time of execution or during the lifetime of the husband, and holding that the consideration could be impeached for the purpose of evading the agreement. As we have seen, the instrument is not within the statute, which contemplates a conveyance made by the intended husband and not assented to by the intended wife. This is a release of prospective advantages, assented to by the intended wife. There can be, as before indicated, no question as to her efficient assent except upon the ground of utter invalidity because of fraud, of which there is no evidence.

It is elementary that, in determining the intent embodied in an instrument, it is to receive a construction, if practicable, which will sustain it and render it reasonable, rather than one which will defeat or render it unreasonable. It is also further elementary that, in the absence of fraud, neither inadequacy nor failure to pay the consideration named in a specialty, can be contradicted for the purpose of defeating it. The consideration may be explained. It may be shown to be other than stated. It may be shown to have been partly paid only, or not paid at all, without any effect upon the validity of the instrument. If partly or wholly unpaid, the instrument, under the circumstances, will be construed, as containing a promise, by implication, to pay, which may be enforced. Those principles are so firmly entrenched in the unwritten law, and so fully demonstrate that the decision complained of is wrong, so far as based on the mere nonpayment of the $500, that lengthy discussion of the matter is needless. The following, including authorities cited by appellant's counsel, fully cover all phases of the subject: 3 Washb. Real Prop. (6th ed.) § 2281; 2 Devlin, Deeds (3d ed.) § 834; 13 Cyc. 535; Jones, Ev. (2d ed.) § 470 (477). Cases referred to in

the notes to these citations: *Haslam v. Jordan,* 104 Me. 49,
70 Atl. 1066; *Spence v. Central Acc. Ins. Co.* 236 Ill. 444,
86 N. E. 104; *McGee v. Allison,* 94 Iowa, 527, 63 N. W.
322; *Luckhart v. Luckhart,* 120 Iowa, 248, 94 N. W. 461;
*Maxwell v. McCall,* 145 Iowa, 687, 124 N. W. 760.

The precise principles last discussed do not appear to have
been heretofore a matter of adjudication in this court, though
they are so well established that, it is probable they have been
applied, to a more or less extent, in many instances.    The
general doctrine as to such unilaterally executed documents
as the one before us, will be found stated, frequently, in sub-
stance, that the mention of a consideration, in an instrument
executed by the party to whom it purports to have moved for
the thing conveyed, and the formal receipt, are mere recitals,
not contractual in character, and may be explained or varied;
but not so as to vary or defeat the instrument for the purpose
for which it was given.   As to such purpose, and that only,
in the absence of efficient fraud, the person executing the
paper is estopped from contradicting the recital.    *Hannan v.
Oxley,* 23 Wis. 519; *Morgan v. South Milwaukee Lake View
Co.* 97 Wis. 275, 72 N. W. 872; *Mueller v. Cook,* 126 Wis
504, 105 N. W. 1054; *Jost v. Wolf,* 130 Wis. 37, 110 N. W.
232; *Ill. S. Co. v. Paczocha,* 139 Wis. 23, 119 N. W. 550.
Thus concisely the rule is stated in *Jost v. Wolf:*

"The recital that there has been paid a consideration, and
what that consideration was, is merely a statement of a fact
theoretically necessary to exist in order that the conveyance
might take effect, but which early became practically a mere
immaterial fiction by reason of the rule that the grantor's seal
raised a conclusive presumption of a consideration sufficient
to support the instrument.    Hence one cannot deny existence
of some consideration in order to defeat the conveyance.    To
that end, however, the correctness of the recital was and is
wholly immaterial, and the authorities, practically without
exception, recognize that it binds no one as to its correctness,
but may be proved, *aliunde,* to have been greater or less or

different in character, as property or services instead of money, and the like, so long as it is not inconsistent with the existence of some consideration to support the conveyance."

The doctrine above discussed was applied in *Maxwell v. McCall,* 145 Iowa, 687, 124 N. W. 760, precisely as it has been suggested here, this being the expression of the court on the subject:

"The deed recites a consideration of $100. This sum was not in fact paid. . . . It is well settled that the recitals of consideration in a deed may be explained by parol evidence. It may be shown that the consideration was either greater or less than, or different in form from, that stated in the deed. . . . Notwithstanding this liberal rule concerning the consideration, it is also well settled that it is not competent to contradict the deed to the extent of showing there was no consideration for the purpose of defeating the instrument, in the absence of fraud or mistake. *It is to be noted further that* a recital of a consideration in a deed makes a *prima facie* agreement on the part of the grantee, in accepting the deed, to pay such consideration and he may be sued therefor."

Now, assuming that the evidence is sufficient to support the finding of fact that the consideration of $500 was not actually handed respondent at the time the antenuptial agreement was made, or thereafter within the lifetime of Mr. Bibelhausen, it does not, of itself, render such agreement void or affect it in any way as a surrender of marital rights in his property. It is doubtful whether the mere evidence of respondent that she never had $500 at one time, or the want of written evidence that such amount was parted with by Mr. Bibelhausen, or other mere circumstances relied on, are sufficient to overturn the *prima facie* effect of the paper, which should stand except in face of clear and satisfactory evidence. For aught that appears respondent might have expressly deferred payment, or left the money in the hands of Mr. Bibelhausen for her use, or it may have been the understanding that payment should wait upon his death or the contingency mentioned in the

paper; or the sum of $500 might have been a mere money measurement of something of a different character which was the real consideration. We cannot tell, because death has closed the mouth of one of the parties to the transaction and the law has closed that of the other. The circuit judge rather unfavorably reflected on this statutory rule. The rule should not be looked upon with disfavor, nor should a presumption of fraud be indulged in to avoid its effect. It is quite as important not to blacken the character of the dead, as to conserve the interests of the living. The settled law should not be disturbed nor overlooked for either purpose. The presumption, in the absence of evidence to the contrary, should be indulged in that, if the consideration of $500 was not paid, there was some understanding in respect to the matter consistent with the recital. The most natural presumption is, if the court below decided rightly at this point, that the deceased retained the money for respondent, at her request, and as her trustee, possession of it to wait upon some future event which could not be postponed later than the *postmortem* distribution of Mr. Bibelhausen's estate.

.The court assumed to pass upon the question of when the period would expire for respondent to take under the will or under the instrument in question. That assumption arose from the erroneous idea that the agreement was within sec. 2170, relating to provisions made before marriage, not assented to by the intended wife, or made afterward with such consent. This was neither. Therefore sec. 2172, fixing the time for election at one year after filing of the petition for settlement of an estate, does not apply, nor does ch. 394, Laws of 1913, providing (sub. 2, sec. 2172a, Stats. 1913) that the period occupied in judicially contesting the validity of the provision characterized by the right of election, shall not count in the time fixed therefor, change the situation. We may well say, in passing, that, since there is no contest of the validity of a will involved in this case, the time for election as to the particular will, is governed by sec. 2172 and expired

in one year after filing of the petition for its probate, viz. November 29, 1913. Moreover, it is considered that, in any event, the rights of respondent became fixed at the time Mr. Bibelhausen died. They could not be changed thereafter any more to her advantage than to her prejudice. The beneficiaries then became absolutely entitled to the estate, according to the terms of the will, subject to such rights as existing law afforded respondent. That, to all intents and purposes, was incorporated into the will and, as an entirety, made a legal and binding disposition of the estate.

Some question is raised as to the validity of the marriage between respondent and Mr. Bibelhausen, because in the divorce proceedings between respondent and her first husband, jurisdiction to render the judgment was referable to an order of publication directing the summons to be published in a particular newspaper "for not less than once a week for six weeks," using the words of the statute. It is suggested that since the statute requires such a summons to be published for such length of time as shall be deemed reasonable, "not less than once a week for six weeks," it is vital to have the precise period of publication specified. That is extremely technical. Strict compliance with the statute, does not preclude reasonable compliance, within a sensible meaning of language, being sufficient. While it may be well to specify the precise time for a publication, as in the form to which reference is made by counsel, the words "not less than six weeks," used in the order, plainly, fixed the period of publication at six weeks, though additional publications would not affect the validity of the service in such a case.

The rule must be recognized that an efficient presumption of fraud in obtaining, by an intended husband, a release from his intended wife of marital rights in the future husband's property, may arise from a manifestly inadequate pecuniary provision in lieu thereof. That is a companion to the rule that marriage itself, under some circumstances at least, is a sufficient consideration to support the contract. A sufficient

consideration is one thing, and such an unreasonable consideration as to appear manifestly unfair and call for explanation, is another. The latter may so far impeach an otherwise valid antenuptial contract as to defeat it on the ground of fraud, unless the *prima facie* case thus made against the instrument is sufficiently rebutted as to leave the proof of deception or undue influence not sufficiently probative to rise to the dignity of that clear and satisfactory proof, essential to convict one of having perpetrated a fraud.

The question last suggested does not seem to have received attention of the trial court. That it was unappreciated seems clear from the circumstance that the court suggested, upon proof being offered respecting the property of Mr. Bibelhausen at the date of the agreement, that it was quite immaterial. There was an offer to prove that he spent most of his money in getting a divorce and had left only a building in the city of Shawano, used for a saloon business, and some little machinery,—and the evidence was rejected. It must be assumed, that the offered evidence would have established what was claimed, supporting the presumption, nothing appearing to the contrary, that the money consideration named in the agreement, was not grossly unfair in view of all the circumstances.

The circumstances referred to, include many things besides the property possessed by the intended husband; among them, the age of the parties, their position in life, the reasonable expectations of a pecuniary nature surrendered, based on present possessions, the ability of the intended husband to acquire property, his habits, his family, the needs of the intended wife, having regard for her age, her family supports and burdens, whether the prospective property advantages were of little consequence, and the companionship and home life in the family relations were the real inducement to marriage without thought of property advantages.

Applying the foregoing, the money consideration named in

the agreement does not appear so small as to overcome its, otherwise, *prima facie* fairness, and raise an efficient inference of fraud.

The fact that respondent testified that when she signed the instrument she did not know what was in it, counts for little, in face of the presumption to the contrary, the entire absence of proof that any artifice was used to prevent her from knowing its contents, and the clear testimony that the paper was explained to her before she signed it and she made no complaint about it until some eleven years had expired and Mr. Bibelhausen had passed away. She was conscious, all the time, of its existence. For some two years it had been a matter of public record, and its general effect she must have known. Indeed, there is no evidence that she did not.

We may say, in passing, that it is not clear whether respondent's evidence which had to do with the transaction at the time she signed the instrument, was intended to be excluded. It was closely connected with proper rulings to that effect, made after a question had been answered, or partly so. But, giving what she said all the effect which it could fairly have, it does not prove want of knowledge of the purpose and substance of the paper; but does indicate that she was indifferent as to the pecuniary matter, incident to the proposed marriage, and was intent only upon the other advantages of the marriage state. Considering her family of children, nearly all of earning capacity, and her property, she appears to have been on about an even plane with Mr. Bibelhausen. Both being divorcees, each with a grown-up family, children of the prospective marriage not probably to be expected, the intended husband past the better part of an ordinary business life without having accumulated property of any consequence,—the pecuniary consideration does not look strikingly unfair, if unfair at all. Subsequent conduct in such a case may be considered. That is well illustrated by *Smith's Appeal,* 115 Pa. St. 319, 8 Atl. 582, where the intended wife was given about

$12,500 out of about $179,000; but, on account of after-acquired property of some over $200,000, $15,000 more was given by will. In view of such testamentary treatment it was held that there was no presumption of fraud arising from the smallness of the first provision.

In this case the great bulk of the property possessed by Mr. Bibelhausen at the time of his death was acquired after his marriage with respondent. Instead of standing on the antenuptial agreement, wholly, as he might have done, and probably would have done had he harbored a thought of dealing unfairly with respondent, he provided for her very generously, considering the fact that he left her free to claim payment, as we shall see later, of the $500, if it had not been paid, and payment of all other money held by him in trust for her; and, further, since he had a son of mature years, in whom he evidently, had great confidence and for whom he had much respect, and two grandchildren, to whom he, obviously, was warmly attached.

Besides leaving respondent unembarrassed as aforesaid, on the faith of which she has filed a claim, as appears, in the administration proceedings, for $2,339.56, which seems to be waiting for final hearing upon the disposition of this case,— he made these provisions for her: *first,* an express preference of claims of creditors over all devises and bequests; *second,* all his household furniture, goods, and effects of every kind and description to have and to hold as her own separate property; *third,* an annuity of $15 per month during her natural life; *fourth,* a life estate in the homestead property free from taxes, general or special, and expense of insurance, such taxes and insurance matters to be a charge on his whole estate; *fifth,* $500 in trust for use in securing for her necessary medical care and attention; *sixth,* $100 in trust for use in defraying her funeral expenses. To insure the faithful execution of such trusts he made his son trustee of his estate. All things considered, the will is quite a model. It was made after some nine years of married life and was left unchanged for the

period of some two years which elapsed thereafter before his death. It evinces the most perfect satisfaction with the marital union and most tender regard for the future of his companion, and confidence in his son that such regard would be vindicated to the end. The aggregate of the express bequests, aside from the advantage of laying claim for any money due respondent, is some $5,000. The annuity, use of the homestead, and the ownership of the house belongings would make some $400 per year. Respondent was sixty years old, or thereabouts, when the will took effect. The value, *in præsenti,* of such an annuity is around the sum named, measured by the tables of reputable life insurance companies—or more than one third of the whole estate. Add thereto the possibilities as to the claim of respondent yet to be heard in county court, and somewhere around two fifths or half of the estate may go to respondent.

On the whole, it seems that respondent acted understandingly when she made the agreement in question, and made no mistake in respect thereto or in the union of her destiny with that of the deceased. She evidently was pretty capable of taking care of her own affairs. Having reared five children, all or nearly all to maturity, had many years of married life with her first husband, secured a dissolution of an unsatisfactory matrimonial contract with him and, incidentally, obtained a substantial property which she managed with her family affairs,—she must be regarded as having been of more than average business ability for one in the station of the parties when she came to arrange for the second union. She, evidently, well knew the man she chose to unite her future with, knew generally of his circumstances, and particularly of his family, his age, and prospects in life. Moreover, she had a daughter, twenty-two years of age, who was her constant companion, her confidant and adviser. We do not overlook the finding that she was a woman of little business experience, but, as indicated, the evidence seems to be to the contrary.

The fact is appreciated that the home, which Mr. Bibel-

hausen so carefully set aside for respondent for life, was disposed of and he moved into another house, owned by him, and lived there to the end. However, it is evident that his purpose was to give respondent the use of the homestead for life and probably such intention persisted to the end. He specially remembered his granddaughter by willing to her the homestead he possessed at the date of the will, subject to the life estate in his wife, and, it is notable, that, while such grandchild was an object of such special regard as to be mentioned in the will next to his wife, and the other grandchild was also generously remembered—showing a purpose to treat both alike—by the *antemortem* sale of the realty described in the will, as the homestead, that feature, as regards being expressly covered, drops out, leaving the granddaughter unremembered and respondent also, as regards the dominant purpose the testator had in mind of bestowing upon his wife a life use of the homestead in which the parties lived at the end. How that is to work out is not before us. We only look to the condition mentioned as bearing on the main facts of the case.

It is observed that counsel claim the trial court pronounced the release void as against public policy, because of the feature designed to preclude the intended wife from having any claim on Mr. Bibelhausen's estate in addition to the stipulated $500, in the event of a separation of the parties after marriage. If such be the case, we are unable to discover it from the court's opinion, nor does it seem to have support, as an original proposition. Counsel point confidently to the text in 9 Cyc. 521, 522, and cases cited. That relates to agreements for separation,—another matter entirely.

Counsel also point to *Baum v. Baum,* 109 Wis. 47, 85 N. W. 122; *Oppenheimer v. Collins,* 115 Wis. 283, 91 N. W. 690; and *Kistler v. Kistler,* 141 Wis. 491, 124 N. W. 1028. Neither has to do with a mere release, for a consideration, of property claims upon the husband's estate in case of a separa-

tion.  The first relates to agreements for a separation.  The second to the status, as regards creditors, of a transfer of property to the wife in consideration of her discontinuing an action for divorce and consenting to continue the marital relation, and the last to an agreement for separation and prosecution to effect, of an action for a divorce.  Discussion is unnecessary to show that neither in principle nor in the facts does either of those cases throw any light on this one.  Whether such an agreement as the one here would be binding on the wife in case of a separation, need not be dealt with.  It is sufficient to say that the agreement is not within the principle of the cited authorities.  Such an agreement might be an inducement to separate, and might promote continuance of the marriage relations, according to circumstances.  In the particular case, the added clause might not have been binding upon the condition happening requisite to its vitality.  Such condition did not happen, and the particular feature does not, necessarily, militate against the dominant purpose of the instrument.

We have now considered every question suggested by the briefs of counsel, or which has been raised in our deliberations, and with more than ordinary fulness.  The capacity to make such contracts as that in question is very valuable, as an individual right, and it is important to society that this should be understood and vindicated, while being carefully guarded so as to conserve its beneficent possibilities without danger of its being abused.  That promotes contracting, continuance of and enjoyment in, the matrimonial relation which sound public policy approves and promotes.  To take away that right, or regulate it destructively, or treat its exercise with disfavor, and entry into the marriage state would be efficiently discouraged in many instances, especially in case of each of the parties concerned having been married before, raised a family, and being so advanced in years that companionship and care and comforts of home life are the paramount objects in

view. In many such cases, capacity to settle in advance, by treaty, property matters would be the turning point. That out of the way, the matrimonial union would have efficient attractiveness, which it is for the best interests of society should exist so far as practicable. The right to so contract is well nigh as important as the right to make a will and is under protection of the same principle that guards all personal rights, subject to regulation for purposes of conservation. The tendency to interfere with these rights, through failure to appreciate the inviolability of them, except where exercise is tainted by fraud or failure to observe the written law as to manner of execution, and to appreciate that fraud is not to be efficiently seen in mere suspicion or unreasonable inference, or without substantial tangible, convincing evidence of it, has had many object lessons in recent years. No matter of the sort should be approached except by the road of legitimate proof, or viewed through the vista of mere imagination and supposition from the particular disposition of property, so long as it is one the disposer had a right to make, and made it understandingly.

*By the Court.*—The judgment is reversed, and the cause remanded for judgment in favor of defendants as prayed for in the answer.

Timlin, J., dissents.