FRICKE, Appellant, vs. FRICKE, Respondent.

*April 6—May 2, 1950.*

Brown, J., dissents.

*Dudley O. Emmert* of Manitowoc, for the appellant.

For the respondent there was a brief by *Nash & Nash*, and oral argument by *A. F. Rankin*, all of Manitowoc.

GEHL, J.  Because of the basis of our conclusion we do not recite all of the facts to which our attention has been called. Counsel have referred to testimony bearing upon the contention that the plaintiff was fraudulently induced to enter into the antenuptial agreement and to that which bears upon defendant's contention that the circumstances proved are such as to call for a determination applicable only to the facts of this case.  We are of the opinion that any antenuptial agreement which attempts to limit the husband's liability in the event of separation or divorce is void as against public policy.

There are three parties to a marriage contract—the husband, the wife, and the state.  The husband and wife are presumed to have, and the state unquestionably has, an interest in the maintenance of the relation which for centuries has been recognized as a bulwark of our civilization.  That unusual conditions have caused a marked increase in the divorce rate does not require us to change our attitude toward the marital relation and its obligations, nor should it encourage the growth of a tendency to treat it as a bargain made with as little concern and dignity as is given to the ordinary contract. Consideration of only material matters, as distinguished from those which concern its religious and moral aspects, demands that the state keep its hand upon the obligation of the husband to maintain and support his wife.  The court should not look with favor upon an agreement which may tend to permit a reservation in the mind of the husband when he assumes the responsibility of maintaining his spouse in such comfort as he is able to provide and until his death or the law relieves him of it.

The state has declared its interest in the marital contract and its purpose to preserve its control over the husband's obligation.  Sec. 247.10, Stats., requires that in a divorce ac-

tion a stipulation by the parties for a division of estate or for alimony to be effective must have the approval of the court. It would seem that if at that stage the court should be consulted there is as good reason to require that a husband should not be given the means to relieve himself from the obligation of his marital contract to provide for his wife until death or the process of law should intervene.

This court has had frequent occasion to consider antenuptial contracts. In each of the cases only the provisions of the contract with respect to the disposition of property on the death of one of the parties were before it. The question of the validity of provisions purporting to limit the husband's liability in the event of divorce or separation has not been before the court.

Counsel for defendant rely heavily upon language used by the court in *Bibelhausen v. Bibelhausen,* 159 Wis. 365, 389, 150 N. W. 516. True, much is there said about the recognized right of the parties to a marriage to contract with respect to the wife's right of dower and other rights in the estate of her husband, and language is used which can be construed to support the contention of the defendant in this case. But the court said:

"Whether such an agreement as the one here would be binding on the wife in case of a separation, need not be dealt with."

Only the provisions of the agreement limiting the wife's right to share in her husband's estate upon his death were dealt with in that case.

At least a majority, if not all of the courts which have considered the matter, have held that any antenuptial contract which provides for, facilitates, or tends to induce a separation or divorce of the parties after marriage, is contrary to public policy and is therefore void. Anno. 70 A. L. R. 826. Quite generally the courts have said that the contract itself invites

dispute, encourages separation, and incites divorce proceedings.

What was said by the court in *Moorehead's Estate,* 289 Pa. 542, 551, 137 Atl. 802, 52 A. L. R. 1251, with respect to a situation somewhat similar to that presented in the instant case can very well be applied here:

"Public policy is not so vague and wavering a matter as not to be rightly invoked in a case of this character, where the degenerating tendencies of marital relations of the present day are so faithfully exemplified by one who comes into court and demands judicial condonation of his violations of law. In every civilized country is recognized the obligation, sacred as well as lawful, of a husband to protect and provide for his family, and to sustain the claim of the husband in the case at bar would be to invest him with a right to be both a faithless husband and a vicious citizen. This case reaches beyond the concern of the immediate parties to it. It affects the status of the family as being the foundation of society and civilization, and hence in a very certain sense is of wide public concern.

" 'The marriage contract once entered upon, becomes a relation rather than a contract and invests each party with a status toward the other and society at large, involving duties and responsibilities which are no longer matter for private regulation, but concern to the commonwealth.' *Coy v. Humphreys,* 142 Mo. App. 92, 125 S. W. 877."

Although dictum, the expression of this court in *Ryan v. Dockery,* 134 Wis. 431, 434, 114 N. W. 820, is also applicable:

"The law requires a husband to support, care for, and provide comforts for his wife in sickness as well as in health. This requirement is grounded upon principles of public policy. The husband cannot shirk it, even by contract with his wife, because the public welfare requires that society be thus protected so far as possible from the burden of supporting those of its members who are not ordinarily expected to be wage earners, but may still be performing some of the most important duties pertaining to the social order. Husband and wife may contract with each other before marriage

as to their mutual property rights, but they cannot vary the personal duties and obligations to each other which result from the marriage contract itself."

A quotation from another opinion rendered in a case involving circumstances, facts, and an agreement similar to those found in the case at bar is properly inserted:

". . . it is beneficial to society that the marital relation should not be disturbed or its happiness marred, but that it should be upheld and encouraged, and that the parties to it should not be led into the breaking of its vows by the allurements of any stipulations which they may enter into before marriage." *Stratton v. Wilson,* 170 Ky. 61, 68, 185 S. W. 522.

We conclude that an antenuptial contract which purports to limit the husband's liability in the event of separation or divorce, regardless of the circumstances motivating its adoption or those attending its execution, is void as against public policy.

Manifestly the trial judge did not consider what provision should be made for the plaintiff in the way of division of estate or alimony because he concluded that he was bound by the provisions of the agreement.

The action is remanded for such allowance to the plaintiff as the court may determine she is entitled to under the provisions of sec. 247.26, Stats.

*By the Court.*—Judgment reversed for further proceedings in accordance with this opinion.

The following opinion was filed on May 8, 1950:

BROWN, J. (*dissenting*). The opinion of the majority states that an antenuptial contract is void, because contrary to public policy, if it purports to limit the husband's liability in event of separation or divorce, regardless of the circumstances motivating its adoption or attending its execution. To express it another way, under no circumstances may the parties before marriage come to a valid agreement concerning the wife's rights or the husband's obligations in case the

marriage is terminated by the courts. Until the court spoke I had not supposed that to be the public policy of this state nor do I believe it should be. On the contrary, in my view a wise public policy is opposed to so uncompromising a statement.

Public policy, of course, favors marriage and is concerned with its stability. I think it must be conceded that, in other relationships, contracts defining the expectations and responsibilities of the contracting parties promote stability. If they are desirable in other human activities there should be, at least, no presumption that they tend to promote discord in marriage. And even in marriage anyone can think of possible problems which it is well to be agreed upon before the ceremony. Yet the court holds that when an antenuptial agreement touches the financial provision, no matter how generous, by a husband for a wife in the event of divorce it is *malum in se* and shall be outlawed regardless of circumstances. Why?

From some of the quotations appearing in the majority opinion it seems to be taken as a fact that if the parties know what the husband must give and the wife will get as a result of divorce one of them will be stimulated to misconduct or to an effort to be rid of the spouse. How this is known I cannot tell, and I doubt if it is so, but if it be true then it seems self-evident that a contract which so encourages one necessarily deters the other. And the one deterred may well be the one who needs that restraint. For example, and taking the husband as the culprit since that is assumed in the illustrations quoted in the principal opinion, suppose that a husband's attention to his wife is wavering. It now appears to him that many of his domestic troubles are her fault. But there exists to his present regret a contract by which, in the days when he thought divorce would never intrude between them, he made what he now considers improvident and extravagant provision for her if that unlikely event ever came to pass. To

me, at least, it seems clear that he will be deterred from beginning an action for divorce by reason of the financial penalty a successful suit would bring upon him and he will take care that his conduct gives his wife no ground for such a suit of her own. Suppose, again, a mature woman with property of her own, more than adequate for her support, and a man whose mother is dependent on him now and after his death if she survives him. He does not have enough income and will not leave enough property to provide support for his mother and the other woman, be she his wife, ex-wife, or widow, and he believes it is his first duty to make his mother secure, come what may. To the woman it is perfectly immaterial what he does with his money. She has no need of it and anticipates none and she will gladly enter into an agreement relinquishing her right to be supported by him. Although it is well established that she may give up her share of his estate in case of his death, the court now says that she may not do it in case of divorce, regardless of circumstances. Hence these people may not marry. I see no resulting benefit to society or any such requirement of public policy. Therefore it appears to me to be impossible to say dogmatically that the influence of such antenuptial agreements tends to destroy rather than to promote and conserve marriage. It depends on the circumstances of the individual case and I should suppose that public policy would require the circumstances to be considered before it could safely be announced that the influence of a particular antenuptial contract was evil.

The court says that the state has an interest in seeing that a husband performs his obligation to support his wife. Of course that is so; and it has an interest, too, in his provision for his widow, to the extent that we have a statute which secures to her not less than one third of his property. Yet public policy, as shown in many decisions by this court, approves antenuptial contracts limiting that obligation. It will

not be asserted, I suppose, that the maintenance of one who has lost her husband by divorce is of more concern to the state than that of another who has lost hers by death; but if it is not, then such a contract which is *prima facie* valid in respect to the widow should be equally valid when it concerns the divorcee, so long as the ascertainable and reasonable effect of the agreement does not promote the dissolution of marriage which, as I have said and as this court said before me in *Bibelhausen v. Bibelhausen* (1915), 159 Wis. 365, 150 N. W. 516, will depend on the circumstances of the case.

The marriage in the instant case was, as the court found on ample evidence, a marriage of convenience between a man of sixty-two and a woman of fifty-six who had been his house-keeper for thirteen years. The woman testified ". . . he wanted that agreement drawn before he would get married." Agreeing with the majority in its praise of the marriage rela-tionship, it seems to me that this contract, whose supposed validity persuaded Mr. Fricke to add another buttress, albeit a temporary one, to the bulwark of civilization deserves a kinder word than it has received. That the marriage which the contract procured was not successful is not an answer. The marriage had a chance to succeed and the contract is not shown to have been responsible for its failure. Without the contract there would have been no marriage at all. Public policy does not require that an elderly woman desiring mar-riage must remain single if she cannot find a man who is willing to leave everything to chance and put his property at the disposal of the court, if someday a court thinks it proper to grant a divorce, but can find one with whom she can make mutually satisfactory agreements concerning a division of property in the same contingency. Believing that it should be the trial court's business to judge the case according to the circumstances and to accord validity to such an antenuptial contract if it appears to have been made understandingly, fairly, and willingly, and in support, not in derogation, of

marriage, I respectfully dissent from the majority who hold that under no circumstances may the parties contemplating marriage recognize divorce as a possibility (although the statutes themselves governing the marital state recognize it) and make financial provision for that contingency.

The *Bibelhausen Case, supra,* deals with that part of a prenuptial contract whose provisions apply in the event of the death of the husband and expressly left for future consideration agreements affecting the husband's financial liability in case of divorce; but I consider that the opinion of the learned Mr. Justice MARSHALL is applicable also to contracts of the latter type. If the safeguards which he prescribes to be applied by the court are applied to the consideration of contracts like the present one, with the appropriate addition that it must also appear that the contract in question was not in fact an inducement to dissolution of the marriage, the true interests of public policy are well served. I do not believe they are, under a rule which prohibits such contracts under any and all circumstances.