FANSLER *v.* FANSLER.

1. DIVORCE—EXTREME CRUELTY—MENTAL IRRESPONSIBILITY.

Mental irresponsibility is not available as a defense to extreme cruelty, claimed as a ground for divorce, if defendant was capable of comprehending and understanding the wrong he was committing (CL 1948, §§ 552.7, 552.8).

2. SAME—EXTREME CRUELTY—STATUTES.

Extreme cruelty is a ground for divorce but is not defined by statute and may arise from either mental or physical grievances (CL 1948, §§ 552.7, 552.8).

3. SAME — EXTREME CRUELTY — EVIDENCE — INTOXICATING LIQUOR — FAULTFINDING.

Evidence, consisting of a course of action by defendant over a period of years of drinking to excess, faultfinding, and embarrassing plaintiff wife on public and private occasions, *held*, to justify granting a decree of divorce to her on ground of extreme cruelty.

4. SAME—EXTREME CRUELTY—CONDONATION—EVIDENCE.

Condonation of defendant's conduct, amounting to extreme cruelty constituting grounds for divorce, before his commitment to hospital for treatment for mental disease *held*, not shown, notwithstanding wife's testimony as to her efforts toward a reconciliation.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 17 Am Jur, Divorce and Separation § 230.
[1] Insanity as affecting right to divorce or separation on other grounds. 19 ALR2d 144.
[2] 17 Am Jur, Divorce and Separation §§ 48, 49.
[3] 17 Am Jur, Divorce and Separation §§ 58, 59.
[4] 17 Am Jur, Divorce and Separation §§ 202, 412.
[5] 17 Am Jur, Divorce and Separation § 197.
[6] 17 Am Jur, Divorce and Separation § 210.
[6] Condonation of cruel treatment as defense to action for divorce or separation. 32 ALR2d 107.
[7–9] 17 Am Jur, Divorce and Separation § 310.

5. Same—Condonation—Conditions.

  Condonation, implying forgiveness for offensive conduct which constituted grounds for divorce, is conditional on the non-repetition of such conduct.

6. Same—Condonation—Continuation of Marital Relations.

  The fact that wife continued to live with her husband in the marital relation, apparently in the hope that the parties might avoid a final separation, is not a bar to the granting of relief to her for earlier extreme cruelty (CL 1948, §§ 552.7, 552.8).

7. Same—Division of Property—Security of Living for the Wife.

  There is no rigid rule for division of property in divorce suits, the security of a living for the wife being a major consideration.

8. Same—Division of Property.

  Award to wife of approximately $10,000 in interests in realty, $1,000 of household furniture and $12 weekly for support of child of the parties and to husband all construction equipment and motor vehicles and all other property which stood in his name *held,* fair and equitable, all circumstances considered, and not an abuse of discretion in a suit for divorce, since the property awarded the husband was income producing, that to the wife was not and she has the responsibility of the child's care.

9. Same—Division of Property—Supreme Court.

  The Supreme Court is disinclined to interfere with the determination of property rights by the lower court as the lower court has the advantage of closer contact with the parties.

Appeal from Branch; Arch (Charles O.), J., presiding. Submitted January 6, 1956. (Docket No. 46, Calendar No. 46,623.) Decided March 1, 1956.

Bill by Miriam P. Fansler against Richard C. Fansler for divorce, custody of child and adjustment of property rights. Decree for plaintiff. Defendant appeals. Affirmed.

*Arthur G. Lyon,* for plaintiff.

*R. J. Megargle* (*Roy H. Hagerman,* of counsel), for defendant.

SHARPE, J.   Defendant Richard C. Fansler, appeals from a decree awarding plaintiff, Miriam P. Fansler, a divorce, custody of a daughter and a property award.   Plaintiff filed her bill of complaint on May 14, 1953, alleging that the parties to this suit were married December 16, 1939, at South Bend, Indiana; that plaintiff and defendant lived and cohabited together as husband and wife until on or about February 15, 1953; that as a result of said marriage 1 child was born, namely, Sandra Fansler, 12 years of age at the time the bill of complaint was filed; that for several years previous to June 12, 1952, defendant was addicted to the immoderate use of alcoholic liquors; that defendant frequently remained away from home until late at night, and when he returned intoxicated he would engage plaintiff in arguments; that defendant's habitual drinking caused plaintiff worry because of his operation of equipment while under the influence of intoxicants; that defendant when drinking would engage in loud and boisterous conversation; that on June 12, 1952, defendant was committed to the Kalamazoo State Hospital by the probate court of Branch county, and remained there until December 20, 1952; that on defendant's return home from the Kalamazoo State Hospital, he continually blamed plaintiff for his commitment, and found fault with her for her operation of business affairs during his confinement; that plaintiff was obliged to secure employment in order to pay expenses of living for the parties and their child; that on May 1, 1953, defendant was restored to soundness of mind; that defendant has persisted in a course of behavior which makes continuance of the marriage relationship an intolerable burden to plaintiff.

Defendant denied most of the material allegations in plaintiff's bill of complaint, alleging that his memory as to occurrences prior to his adjudication as

mentally incompetent is vague; that he could have been unreasonable prior to his commitment as his mental illness preceded the commitment by a long period of time; that the burden of the family support was never shifted to plaintiff while defendant was confined to the Kalamazoo State Hospital, as defendant's estate was more than sufficient to take care of the plaintiff's and daughter's requirements; that he found no fault with plaintiff's operation of business affairs during his confinement; that since defendant's restoration to soundness of mind his conduct towards plaintiff was proper, and he did no act that could be construed to be grounds for divorce; that all acts prior to defendant's restoration to soundness of mind were condoned by plaintiff.

On trial in the circuit court of Branch county both parties offered testimony to substantiate the claims made in their pleadings. After listening to proofs, the trial court came to the conclusion that plaintiff had made out a case for a decree of absolute divorce and entered a decree accordingly. The court, by its decree, gave to plaintiff the home valued at $15,000, subject to a mortgage of $5,698.60, or equity of $9,-301.40, plus the 2 vacant lots adjacent to the home, which combined valuation was $700, and also the household furniture which was valued at approximately $1,000. The trial court also ordered the defendant to pay $12 each week for the support and maintenance of the minor child, until said child reaches the age of 18. The defendant was granted, as his separate property, all construction equipment pertaining to his business operation, all motor vehicles owned by the parties, and all other property, the title to which stands in his name.

Defendant, in his reasons and grounds for appeal, urges:

"1. That [the] court erred in granting plaintiff a divorce.

"2. The court erred in not finding no cause of action.

"3. The court erred in not finding that defendant was mentally ill all during the time plaintiff alleges acts of cruelty.

"4. The court erred in not finding that said parties became reconciled.

"5. The court erred in not finding that plaintiff condoned defendant's conduct.

"6. The court erred in finding that plaintiff's loss of affection for defendant over a long period of time was warranted and resulted from legal cruelty.

"7. The court erred in finding that defendant's occasional drinking over a period of 'many years,' and his boisterousness during the time when he was mentally ill constituted grounds for divorce.

"8. The court erred in an inequitable division and distribution of property.

"9. The findings of the court, in the light of the evidence constitute a breach of discretion on the part of the court."

Question 1:  Did the trial court err in granting plaintiff a decree of divorce?

Plaintiff testified that shortly after her marriage to defendant he became addicted to the immoderate use of alcohol, and on numerous occasions, he would come home from work at late hours intoxicated; that in 1946 when defendant started his own business the situation was getting worse; that on a social evening out together defendant would pick arguments, and in public would refer to plaintiff as "my old battle axe," and that:

"Previous to June 12, 1952, he was drinking heavily and was gone almost continually.  He just did not seem to stay in the house at all and if he were home, he would drink 10 or 12 beers in the evening.  His excessive drinking and his operation of heavy con-

struction equipment caused me to worry. Our daughter was upset by the discussion we had and was a nervous child. Since we have been in St. Joseph she is more settled. When we were in public, he would be loud, and boisterous and on New Year's Eve, the year before last, I went to the Eagles hall to meet him and as I walked in he said, 'Here comes the old lady now,' and proceeded to crawl under the table. I think we stayed about a half hour after that and came home. I was embarrassed. That was typical of his attitude. He wanted to be the center of attention. * * *

"In February of 1953, we ceased living together as man and wife although we continued to occupy the same dwelling for a time.

. "After his restoration to soundness of mind on May 1, 1953, before I started this action, we had 1 argument and from time to time he expressed dissatisfaction with me and on 1 occasion he informed me he was handling his own affairs and if I did not like it he thought we should get a divorce. He did not like it when my daughter and I would go out together but he would not say anything about it but disregarded us on those occasions. He criticized my handling of the business to other people and I have heard him say to others that he had no business having to be put in Kalamazoo and that I mismanaged his affairs. He never accepted the fact that I alone had nothing to do with it. * * *

"There were sufficient amounts of income to keep me and our daughter at the time 'Red' was confined, but the doctor told me he would probably be off a year or possibly more and I did not know how long he would stay and I felt that I should seek another job so that if he should be at the hospital longer, I would be able to take care of ourselves. * * *

"My husband was always of a nervous disposition, high-strung, easily excited, ever since we were married. I do not think there was more than 1 or 2 years that we lived together what you would call happily. * * *

"I lost my affection for him because of his continual drinking, and not being able to depend upon him for anything so far as the family was concerned. I tried to talk to him and he would promise to stop drinking and maybe for 2 or 3 weeks he would stay home, then he would start in again. When he returned to Cold-water after his commitment, I thought there might be a prospect of change, but I did not really feel any affection for him, and I thought maybe if he found religion and would straighten out and live like we wanted to, I thought possibly we could make a go of it. His criticism, faultfinding of me made me realize that I could not longer tolerate the marriage.
\* \* \*

"On occasions, Mr. Fansler was mean to me when drinking and at 1 time when we were living in Michigan with several persons present, we had an argument when I told him not to holler at our daughter and he said, 'I will show you,' and he hit me to the point where I had bruises. They had all been drinking, had been playing around and having beer."

The trial court in his opinion stated:

"Unfortunately he (defendant) was addicted to the excessive use of intoxicating liquor I am satisfied for many years, and he did drink to excess, greatly to excess. I am inclined to believe that he became boisterous at times and extended himself farther in that field than he should, and certainly farther than he would do at the present time under the present circumstances, and he came to the point where he reached the breaking point as many people do, if certain things happen at the right time and the right combination none of us are equipped to withstand the shock. He reached that point, became mentally ill, it was necessary for him to be committed to an institution for care and treatment, and in 6 months he made an uneventful recovery and returned home, and since that time the court is satisfied he has not drank a drop. I think he is to be congratulated, I do not know how he did it, I do not understand it, but

I am satisfied he did and I think it is a remarkable thing. His boisterous attitude was somewhat changed and he became a more peaceful and quiet citizen among the people of this community. He has been able to do considerable work and is working at the present time. * * *

"The court can see the position of Mrs. Fansler; that over this long period of time her love and affection for this defendant gradually became less and less until it came to the point where she could not take it any longer, and on his return from the hospital distressing things came up, which coupled with the loss of love and affection which has grown up over many years simply overwhelmed her to the point where she felt she must seek relief from the court by way of divorce. * * *

"But I am satisfied, that after listening to all of the evidence in this case that plaintiff has made out a case for a decree of absolute divorce, and I am going to grant relief."

Defendant's testimony relating to his return from the hospital is as follows:

"I recall one thing, my wife came over and sat down on the foot stool, laid her hand on my knee and said 'Welcome home papa, glad you are back' or something like that 'we will begin new from here and try to make the best of it,' something to that effect. I do not say that is word for word the way it was. She referred to the family as 'we' and did not say for Sandra's sake. From the time that I came home, my wife and I lived together as man and wife quite happily until she put in her bill. * * *

"I was trying to be happy there with my wife and family. I was trying to be and thought I was and it takes time, I think, in other words, from the way some of our soldier boys come back and have to be readjusted again, that is more or less the way I look at it, more or less a readjustment period. I have not absolutely drank any alcoholic liquors since returning from the hospital. I have attended church

quite regularly. There have been some Sundays I missed. I am trying to live an entirely different life than I previously led. I heard the testimony yesterday or Thursday that I had drank at various times through my married life excessively. * * * At times maybe I did, we all did, times I can recall I think I can say we both (did) together. * * *

"After my return from the hospital and prior to the time my wife left me, we got along fairly well, no heated arguments, no fights—no knockdowns and drag-outs, no serious arguments, except what I have testified to as discussions. I was surprised when she informed me that she was going to get a divorce on February 15th or 16th."

We must consider defendant's mental disease in passing judgment on his conduct. Defendant urges that he cannot be held responsible for his actions previous to restoration to soundness of mind on May 1, 1953.

Dr. Edwin J. Rennell, who examined the defendant on June 9, 1952, 3 days before his commitment to the Kalamazoo State Hospital, testified:

"My diagnosis was manic-depressive psychosis. This type of condition is usually gradual in its onset and it may be a relatively long period of time in coming on, although there is a good deal of variation in individual cases. Sometimes the symptoms are not recognized by those about him for some little time after they have begun until they become developed to a point where they are very noticeable. It is very characteristic of this type of illness to have a number of attacks; I think maybe an attack which he had at the time I described them is a manic type of attack or they may be of the opposite type which we call the depressed type.

"From examination alone one would be unable to determine when the patient first contracted the psychosis, or to arrive at any conclusion. In order to arrive at any opinion like that one must depend upon

the history furnished by someone who was in close contact with the patient. In talking with his wife she indicated that 2 years previous, approximately to June, 1952, he had a period of depression which in my opinion was directly related to his condition at that time, and that some time previous to that he had another series of depression. In regard to this attack in which I saw him she felt that this had begun during the previous—I think that winter.   *   *   *

"Any mental condition in which a person would have a severe psychosis could not very effectively carry on a business. A person could not attempt, which (with) a psychosis as severe as it was when I saw Mr. Fansler, to carry on a normal business. In a general way, it is true that the depression or perhaps the elation which appears back before the examination might have an exhibition at the time of examination but might to the person who observed the person have little significance at the time of its happening. I cannot say that in Mr. Fansler's case. In other words he was not severely ill enough to want a hospital; he went to a psychiatrist instead."

We cannot determine from the medical testimony in this case the exact date of the beginning of defendant's mental disease. It would seem to be a matter of speculation so far as medical science can determine, as the doctor who testified stated, "there is a good deal of variation in individual cases." We must look elsewhere for information as to defendant's mental condition previous to his commitment to the Kalamazoo State Hospital. The acts complained of began shortly after the parties' marriage in 1939. It is apparent from the record that defendant conducted his business of earth-mover contractor successfully, which can be measured by his acquisitions, up until the spring of 1952. It is improbable that defendant would have been able to carry on his business so successfully if he had been suffering from a mental disease. It would seem that if the defendant was capable of carrying on a business, he was able to

comprehend the mental cruelty he was imposing on plaintiff. There is no evidence in the record to show that defendant exhibited any signs of a mental disease up until the fall of 1951 when he was treated for a nervous breakdown. Mental irresponsibility is not available as a defense to cruelty if the defendant was capable of comprehending and understanding the wrong he was committing. 9 RCL, Divorce and Separation, p 334, § 113.

CL 1948, §§ 552.7, 552.8 (Stat Ann §§ 25.87, 25.88), provide that a divorce may be granted on the ground of extreme cruelty, but does not define extreme cruelty. In *Brookhouse* v. *Brookhouse,* 286 Mich 151, this Court said that grievances, to justify a decree, may be mental or physical, if they are of a sufficiently aggravated nature. We think that there was sufficient evidence to support the findings of the trial court in awarding plaintiff a decree of divorce, in that the mental cruelty inflicted on plaintiff by the defendant's actions over a period of years constitutes cruelty under Michigan law. *Hall* v. *Hall,* 172 Mich 210.

Defendant also urges that plaintiff condoned his conduct in the period prior to his commitment to Kalamazoo State Hospital and became reconciled with him, which would deprive her of any legal grounds for divorce. We are unable to find any testimony in the record that plaintiff forgave defendant his wrongful treatment, other than plaintiff's testimony that she "tried to give him reconciliation," and that:

"When we returned to Coldwater, I continued the marriage and the home in hopes there might be some prospect of a change. I really did not feel any affection for him, but I thought possibly if he had quit drinking and if he had found religion and could straighten out and live like we wanted to, I thought possibly we could make a go of it."

It is defendant's testimony that upon his return from Kalamazoo State Hospital, plaintiff said, "Welcome home papa, glad you are back, we will begin new from here and try to make the best of it." From the testimony in this record we are satisfied that plaintiff did try to effect a reconciliation with the defendant upon his return from the hospital, but we are unable to find anything in the record indicating that plaintiff condoned defendant's wrongful treatment. In *Austin* v. *Austin,* 172 Mich 620, we said:

"Numerous but unsuccessful attempts on the part of a wife to live peaceably with her husband, who treated her with extreme cruelty, did not condone the offense so as to deprive her of her right to a divorce." (Syllabus.)

In *Bohlka* v. *Bohlka,* 318 Mich 468, 473, this Court said:

"It is also contended by appellant that appellee condoned her acts of extreme and repeated cruelty towards him by continuing to live and cohabit with her. Condonation, implying forgiveness for offensive conduct, is conditional on the nonrepetition of such conduct. In the case at bar, the acts of extreme and repeated cruelty, on the basis of which relief was granted by the trial court to appellee, were continuous during the period of time that the parties lived and cohabited together. The fact that appellee continued to live with appellant in the marital relation, apparently in the hope that the parties might avoid a final separation, was not a bar to the granting of relief to him. *Tackaberry* v. *Tackaberry,* 101 Mich 102; *Austin* v. *Austin,* 172 Mich 620."

The above was again quoted in *Durham* v. *Durham,* 331 Mich 668. An examination of the record satisfies us that the wrongful acts of defendant were never condoned by plaintiff.

Question 2: Did the trial court err with regard to the division of property between the parties?

There is no rigid rule for division of property in divorce actions. The security of a living for the wife is a major consideration. *Hallett* v. *Hallett,* 279 Mich 246; *Morrish* v. *Morrish,* 338 Mich 261. Defendant complains that the trial court's division of the property was inequitable in that he did not divide the property equally between the parties. It must be taken into consideration here that the property awarded to defendant was income producing, whereas the property awarded to plaintiff was not. We must also take into consideration the fact that plaintiff was awarded custody of the child of the parties, and therefore has the responsibility of the child's care. In the recent case of *Whittaker* v. *Whittaker,* 343 Mich 267, 272, we quoted with approval from *Cartwright* v. *Cartwright,* 341 Mich 68, 76, as follows:

" 'We have held that under the law of this State a division of property need not be equal but rather should be fair and equitable under all of the circumstances involved.' "

The Supreme Court is disinclined to interfere with the determination of property rights by the lower court, the lower court having the advantage of closer contact with the parties. *Manigold* v. *Manigold,* 304 Mich 310. We are unable to find that there was an abuse of discretion on the part of the trial court in the division of the property between the parties.

The record shows that reconciliation between the parties is almost impossible. The hostility exhibited by the parties has indicated an unhappy and unhealthy domestic situation.

The decree of divorce is affirmed, with costs to plaintiff.

DETHMERS, C. J., and SMITH, REID, BOYLES, KELLY, CARR, and BLACK, JJ., concurred.