CALDWELL (Vivian), Plaintiff and Respondent, v. CALD-WELL (Hugh M.), Defendant and Appellant: CALD-WELL (Hugh M., Jr.), Defendant and Appellant.

*September 12—October 7, 1958.*

For the appellant Hugh M. Caldwell there was a brief by *Callahan & Arnold* of Columbus, and oral argument by *Carroll B. Callahan*.

For the appellant Hugh M. Caldwell, Jr., there was a brief by *Rogers & Owens* of Portage, and oral argument by *Phillip Owens*.

For the respondent there was a brief by *Howard W. Latton* of Portage, attorney, and *Rieser, Mathys, McNamara*

*& Stafford* of Madison, of counsel, and oral argument by *Mr. Latton* and by *Mr. Robert W. Smith* of Madison.

WINGERT, J.   The judgment must be affirmed in all respects save that dealt with in part 7 of this opinion.

*Defendants' appeal.*

1. *Divorce properly granted to Vivian.*   The trial court found as facts that the doctor had, without justification, pursued a course of cruel and inhuman treatment of Vivian over a period of several years; that he had frequently threatened her with physical harm and violence and on numerous occasions had physically struck and mistreated her; that he frequently criticized her and manifested a violent and uncontrollable temper; that shortly before the action was commenced, while she was ill, he held a hammer over her head, threatening to strike her if she did not comply with his wishes; that he frequently criticized her in the presence of her child or third parties over her housekeeping, her cooking, and her practices as to bringing up the child, all without justification; that on several occasions Vivian had been forced to leave him temporarily because of his threats and physical treatment and abuses, and after each return to living together he recommenced his cruel and inhuman treatment; and that as a result of this treatment Vivian had been made nervous and upset, and it is no longer safe for her to reside with the doctor.

These findings support the judgment of divorce. They have ample support in the testimony. While some of the facts found were disputed, and there was much testimony with respect to provocation from Vivian's own derelictions, the trial court was within its province in believing Vivian's version and discounting that of the doctor. We need not incumber the Wisconsin Reports with a detailed recital of the

evidence on these unfortunate matters. We have examined it and conclude that it supports the findings.

Condonation was not shown. Vivian's repeated returns to the doctor after leaving him because of mistreatment did not amount to condonation, since condonation is conditioned on subsequent good conduct and is abrogated by similar misconduct thereafter. *Schreiber v. Schreiber,* 2 Wis. (2d) 484, 488, 87 N. W. (2d) 243. She did not return after the hammer incident. Her later testimony that she had forgiven the doctor because of his ill-health falls far short of condoning his violent and abusive acts, for condonation also requires a restoration of the offender to his former status. 1 Nelson, Divorce and Annulment (2d ed.), p. 373, sec. 11.01.

There is no room for the argument that Vivian failed to show sufficient impairment of her health to warrant a divorce. The trial court's finding that it was no longer safe for her to reside with the doctor, supported by evidence of repeated acts which would naturally cause a wife great fear and mental suffering and render serious impairment of health probable if continued, is enough. Cuts, bruises, black eyes, and bloody noses are impairments of health, though minor and temporary. A wife is not obliged to suffer such abuses until a major and permanent impairment has been accomplished.

The principal contention made on behalf of the doctor is that his mistreatment of Vivian in the respects found by the court was due to an uncontrollable irritability resulting from his ill-health. Mental incompetency is expressly disclaimed, but it is argued that when the doctor mistreated his wife he was ill to the point where his impulses in that direction were irresistible and it was impossible for him to restrain his actions.

There was evidence that among the ailments which practically incapacitated the doctor and caused him to be hospitalized frequently was cerebral arteriosclerosis, which may

impair mental functioning and create irritability and personality changes. Vivian admitted that the instances of violence took place when the doctor was having one of his "slumps," and that things were better when he was feeling better. "Most of the difficulties we had came about because of [his] ill-health." A physician who had treated the doctor on several occasions expressed the opinion that if he was suffering from "this cerebral decomposition" (counsel's language, probably meaning cerebral arteriosclerosis) when he threatened his wife, he would not be responsible for his actions, and if he threatened or struck his wife his action would be caused by his illness. The same witness testified that on one occasion he had had the doctor put in restraints when he was in one of his "periods of recession." Asked whether the doctor might be irritated and upset and still be responsible for his actions, the witness replied that "it depends on the amount of irritation that is present. That is true of all of us." In response to a question whether the doctor was showing signs of cerebral arteriosclerosis on the occasion of one fracas with Vivian, the witness answered, "Not being there, I certainly wouldn't know his condition at that time."

On the other hand, the doctor himself testified that his mental condition had never been affected during the marriage "unless I was under an anesthesia or something like that," that he did not believe he had cerebral arteriosclerosis, and that no doctor ever had told him that he had it or that he had a mental condition.

On this and other evidence the trial court found that the doctor was "fully mentally competent" when the acts of cruel and inhuman treatment took place, and that such acts were committed without justification. No finding was made on the matter of irresistible impulse, although in his accompanying opinion the learned trial judge expressed the view that many of the acts complained of were the result of the doctor's illness.

The finding that the doctor was mentally competent at all material times is sustained by sufficient evidence. Undoubtedly, as the medical witness testified, the doctor has "a hair-trigger disposition," but that alone is no defense. On this record we are unable to say that it was so clearly proved that all the acts of cruel and inhuman treatment, or indeed any of them, were the result of irresistible impulse attributable to disease, that a finding to that effect should have been made.

We therefore find it unnecessary to consider whether irresistible impulse of pathological origin would be a defense to the divorce action if proved and found to have been present with respect to all of the acts of cruel and inhuman treatment.

This court has apparently not decided the extent, if any, to which mental infirmity may be a defense to charges of cruel and inhuman treatment in a divorce case. Many cases on the subject from other jurisdictions are cited in Anno. 19 A. L. R. (2d) 144, and in 1 Nelson, Divorce and Annulment (2d ed.), pp. 231 and 355, secs. 6.09 and 9.06. Some courts have stated broadly that insanity is a good defense, but the majority view appears to be that if the nature of the mental illness is such that the victim is conscious of what he does and knows that what he does is not right, although in doing the act he acts under the compulsion of a diseased mind which prevents him from abstaining therefrom, his infirmity is no defense. See, for example, *Fansler v. Fansler,* 344 Mich. 569, 579, 75 N. W. (2d) 1, 6, and cases cited in 19 A. L. R. (2d) 151, 152. We leave the subject with the comment that divorce is not primarily a matter of punishing the erring spouse for his bad behavior, but is directed principally to the protection of the wronged spouse and the prevention of the evils incident upon the continuation of a marriage relation which has become unbearable. The two latter considerations apply equally, whether

or not the wrongdoer is mentally or morally responsible for his act.

The doctor makes much of Vivian's marriage promise to take him in sickness and in health. We cannot construe that as a promise to tolerate indefinitely the violent and abusive treatment found by the court to have been accorded her, even if the doctor were not accountable for his actions.

2. *Denial of divorce to defendant.* The doctor counterclaimed for divorce, and testified to various acts of violence and other errors of commission and omission on the part of his wife. Vivian denied wrongdoing, although admitting some things, as for example having given the doctor a black eye in a fight which he started. The trial court believed her, and found that the doctor's allegations of cruel and inhuman treatment were not supported by the evidence. The finding has support in the testimony, and must be sustained. Accordingly the counterclaim was properly dismissed.

3. *Prenuptial agreement properly declared void.* A few days before their marriage, the parties executed a written contract which provided, among other things, that in the event either party should obtain a divorce, the husband would pay the wife and the wife would accept $20,000 in complete settlement of property rights including alimony, support money, attorney's fees, and costs of any kind. The trial court held this feature of the agreement void as against public policy, on the authority of *Fricke v. Fricke,* 257 Wis. 124, 129, 42 N. W. (2d) 500. In that case it was held, on careful consideration, Mr. Justice BROWN dissenting, that,

". . . an antenuptial contract which purports to limit the husband's liability in the event of separation or divorce, regardless of the circumstances motivating its adoption or those attending its execution, is void as against public policy."

We are asked to overrule that case, but are unwilling to do so. While some members of the court as now constituted would prefer the views expressed in the dissent if the matter were an original proposition, we do not consider ourselves at liberty to reject the considered decision of our predecessors merely on that account, there having been no change of conditions of which we are aware which would render the decision obsolete.

It is contended that in the case at bar the tendency of the prenuptial agreement, if valid, would have been to preserve the marriage and discourage divorce, because Vivian married the doctor for his money and had she known she could get only $20,000 by divorcing him she would have stayed with him as the more-promising course; and therefore the prenuptial agreement accords with public policy and should be held valid, as an exception to the *Fricke* rule. This contention cannot prevail. The characterization of Vivian as utterly mercenary is not one that we are required to adopt in the absence of a finding on the subject by the trial court. The effect of the prenuptial agreement, or of the *Fricke* rule, on her thinking is pure speculation. It is not shown that she knew that the agreement was invalid when she decided to seek a divorce. Moreover, the proposition that the validity of an antenuptial agreement limiting the husband's liability in the event of divorce should depend upon its probable tendency and effect in the circumstances of the particular case was forcefully urged by Mr. Justice BROWN in his dissent in the *Fricke Case,* and was rejected by the majority of the court, by whose decision we feel bound.

Since we hold the presently pertinent feature of the prenuptial agreement void as against public policy, we need not consider the further contention that it was also voidable because Vivian was induced to sign it by fraudulent misrepresentations on the part of the doctor. The trial court made no finding on that point.

4. *Gift of securities to son properly set aside.* The action for divorce was commenced on November 15, 1956. Vivian had left the doctor's home on October 28, 1956, immediately after the hammer episode. Three days later, on October 31, 1956, the doctor transferred or purported to transfer to his adult son by his first marriage, the defendant Hugh M. Caldwell, Jr., shares of various corporate stocks worth approximately $91,600 together with 5,568 shares of the stock of Fall River Canning Company, the value of which was in dispute but substantial. These assets constituted more than half of his estate in value. Hugh, Jr., gave no consideration for the transfer, which the doctor characterized as a gift. The court found that the stocks thus transferred contributed the major share of defendant's income; that Vivian and her child were dependent to a great extent on the income from the said stocks for their maintenance; that Hugh, Jr., was not dependent on his father; that the attempted transfer was made with the actual intent to cheat, hinder, and delay Vivian and her son and to prevent her recovering adequate alimony, support money, and a fair division of the estate; that defendant intended thereby to remove the stocks and the income thereof from the jurisdiction of the court in a divorce action; and that the doctor's assets, other than the transferred stocks, produced a very small income, insufficient to maintain Vivian and the child in the future, the doctor being unable to practice his profession by reason of ill-health.

These findings are adequately supported by clear and satisfactory evidence. The gift had not been planned, and was hastily made three days after the hammer incident, when Vivian finally told the doctor she would not return to him. The doctor himself testified that he made the gift when "upset over Vivian leaving me" and because "I didn't want her to get her hands ahold of it." No other credible explanation of the gift or of the haste in making it was given. The gift constituted practically all of defendant's income-

producing assets, and he testified that it did not leave him enough income to support himself and his family. The son was able-bodied, had a job, and had already received about $20,000 from his mother's estate and a gift of the same amount from his father. After delivery of the assigned certificates, no steps were taken to have the stock transferred on the books of the corporations.

The findings support that part of the judgment which sets aside the attempted transfer.

It has been held in many cases that where the husband has made a gift or transfer, without consideration, of a substantial portion of his property to a third person in order to avoid payment of alimony or support money which might be ordered against him in a pending or expected divorce suit, the transfer is voidable as a fraud on the wife. Anno. 49 A. L. R. (2d) 521, 527, 556; Anno. 79 A. L. R. 421. Obviously the same rule applies where the purpose of the transfer is to escape or minimize the division of property in favor of the wife in case of divorce. Where such a transfer has been made, the court has power in the divorce action to make the transferee a party and to cancel the transfer, at least to the extent necessary to protect the rights of the wife and minor child. *Damon v. Damon,* 28 Wis. 510, 515; *Way v. Way,* 67 Wis. 662, 666, 31 N. W. 15; *Hanson v. McCarthy,* 152 Wis. 131, 133, 139 N. W. 720.

Sec. 242.07, Stats., provides:

"Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

Here the court found, on ample evidence, that the transfer of stocks was made with actual intent to hinder, delay, and defraud Vivian and the minor child. "Creditor" as used in sec. 242.07, Stats., is defined in sec. 242.01 (3) as " a per-

son having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent." We consider that Vivian was a creditor, future if not present, within that definition and within the meaning of sec. 242.07, and that the trial court properly held the transfer fraudulent as to her. Accordingly the court properly set aside the transfer. Sec. 242.10.

It is urged that the court erred in setting aside the transfer, because defendant still had other property sufficient to satisfy the award made to plaintiff. *Varney v. Varney*, 54 Wis. 422, 424, 11 N. W. 694. We consider, however, that the trial court acted within the bounds of reasonable discretion in setting aside the entire transfer.

While after the transfer defendant retained assets estimated to be worth some $95,000, most of such assets were not producing income. The court found as a fact, on sufficient evidence, that the transferred stocks contributed the major share of defendant's income, and further, that the plaintiff and the minor child have been and now are dependent to a great extent on the income from these stocks for their maintenance. The doctor's ill-health prevented profitable practice of his profession. While the property division awarded the plaintiff could perhaps have been paid by liquidating most of the doctor's remaining assets, there would still remain the obligation to contribute to the support of the six-year-old boy, which obligation the court fixed initially at $100 per month, subject of course to probable increase as the boy's education requires larger expenditures.

Having found that the husband deliberately transferred most of his income-producing assets without consideration in order to defeat the legitimate claims of his wife and minor child, the court was not required to make a nice calculation as to how much would have to be restored to assume performance of his obligations, but had discretion to set aside the entire transfer.

5. *Property division not excessive.* The court awarded plaintiff as division of property $65,000 plus one third of defendant's stock in two canning companies, as to the value of which the parties were in dispute. She also was awarded an automobile worth $500 and bank accounts of about $3,300 standing in her name. No alimony was allowed.

The share thus awarded was approximately one third in value of defendant's total assets—the fraction which this court has on occasion declared to be the norm or starting point for determining such an allowance, subject to be increased or decreased according to special circumstances. *Gauger v. Gauger,* 157 Wis. 630, 633, 147 N. W. 1075; *Hull v. Hull,* 274 Wis. 140, 144, 79 N. W. (2d) 653. One third is merely a starting point, not a maximum; and only recently this court has sustained an award to the wife of nearly all the husband's property, *Burg v. Burg,* 1 Wis. (2d) 419, 85 N. W. (2d) 356, and of forty per cent of the estate plus substantial alimony, *Allen v. Allen,* 3 Wis. (2d) 100, 102, 87 N. W. (2d) 797.

Arguing that in this case the award was excessive, it is contended that Vivian married the doctor for his money, that she had nothing when she married him, that nearly all of his estate was acquired prior to the marriage, and that she was not a good wife to him. Concededly she brought no substantial amount of property to the marriage, and the doctor's holdings were not greatly enlarged during the marriage, though their value may have increased. The evidence on Vivian's motives and conduct was disputed, and the court specifically found on sufficient evidence that she did not give the doctor cause or justification for his ill-treatment of her. On the other hand, on evidence which the court believed and had a right to believe, the doctor's treatment of his wife was outrageous. Such treatment justifies a larger allowance by way of alimony or property division than would otherwise be permissible. *Pauly v. Pauly,* 69 Wis. 419, 422, 34 N. W.

512. The fact that most of the husband's estate was accumulated before the marriage does not necessarily require the award to the wife to be drastically limited. See *Roberts v. Roberts,* 253 Wis. 305, 310, 34 N. W. (2d) 130, where an award of $87,000 out of an estate of $287,000 was approved in such a case.

While plaintiff was only thirty-one years old at the time of the decree, her most readily marriageable years were past, and with a young child to care for, the court was not required to assume that another marriage will be available to her, nor that she will have much earning power, for she must make a home for the child, which requires time and care as well as money for the best results; and she herself is somewhat handicapped by periodically disabling headaches. The court could reasonably consider that she and her child should enjoy a standard of living not too far below that of which the doctor's wrongdoing deprived them. On the other hand, the doctor has no other dependents; his older son has already received $40,000 by inheritance and gift, and while defendant is in poor health and unable to practice his profession, he receives disability payments of $2,400 per year, a salary of $1,500 per year from a canning company which an official of the company testified would probably be continued; and also should receive substantial dividends and interest, the amount of which will depend on the extent to which he meets his obligations to plaintiff through the liquidation of non-income producing property.

All in all, we think the award of approximately one third of the husband's estate was within the proper bounds of the court's discretion, which is wide in such matters. The doctor is in poor position to claim hardship, since he himself tried to give away upward of $100,000 of his estate without consideration on the eve of the divorce action, and urged the trial court and this court to sustain the gift and not set it aside.

It is argued that in determining the award the court should not have included in the defendant's estate the value of the securities which he had transferred to his son; in other words, the court should have approached the division of property from the standpoint of an estate of some $95,000 instead of more than double that amount. But the transfer to the son having been made, as the court found on sufficient evidence, for the intended purpose of hindering, delaying, and defrauding the plaintiff and her child and escaping the doctor's obligations to them, and the court having properly set the transfer aside, it was proper for the court to consider the transferred property as a part of the husband's estate in fixing the award to the wife. To leave it out of consideration would be to reward the husband for his wrongdoing, and would defeat the purpose of the law which permits such transfers to be set aside.

It was argued to this court orally, though not in the briefs, that costly gift-tax complications may attend the setting aside of the transfer. Whatever difficulties of that sort may arise, they result from the doctor's own act found to have been a deliberate fraud on his wife and child, and they need not enter into the court's calculations.

*Plaintiff's motion for review.*

6. Since the material part of the prenuptial contract is void as against public policy, we need not consider plaintiff's contention that the contract should have been declared void because induced by fraudulent misrepresentation.

7. *May court impose trust for support of child during minority?* Vivian contends that the court should have required the doctor to place assets in trust to provide for the support of the child during his minority.

The trial court considered that possibility, but disposed of it as follows:

"This court is of the opinion that it does not have juris-diction and power to provide for the support of said minor child during any other period except during the lifetime of the defendant doctor. If it did have jurisdiction and power to so do, this court feels that it would provide and require the defendant doctor to set up funds in a trust to provide for the support of said minor during his minority."

While the matter of requiring security for child support in a divorce action is largely discretionary even on the as-sumption that the power to do so exists, we think it advisable to consider the power of the court in the premises, since the trial court based its refusal of security on the ground of want of legal authority.

We are satisfied that the court may, in a proper case, require the father or his estate to provide for the support of a minor child after the father's death if that should occur while such support is otherwise in order. It has been so held in a number of states. Anno. 18 A. L. R. (2d) 1126, 1130; 17A Am. Jur., Divorce and Separation, p. 52, sec. 865. See, for example, *Miller v. Miller,* 64 Me. 484, 487; *West v. West,* 241 Mich. 679, 684, 217 N. W. 924; *Garber v. Robit-shek,* 226 Minn. 398, 403, 33 N. W. (2d) 30; *Guggenheimer v. Guggenheimer,* 99 N. H. 399, 402, 112 Atl. (2d) 61; *Morris v. Henry,* 193 Va. 631, 641, 70 S. E. (2d) 417; *Spencer v. Spencer,* 165 Neb. 675, 87 N. W. (2d) 212, 219.

"Death of the father required to support his children does not necessarily terminate the allowance made for their sup-port, and it is generally held that his death does not terminate the liability unless otherwise provided by the divorce decree or by the agreement of the parents." 2 Nelson, Divorce and Annulment (2d ed.), p. 100, sec. 14.91.

We have found no authority to the contrary in Wisconsin.

The court is entitled, in rendering a judgment of divorce, "to make such further provisions therein as it shall deem just and proper concerning the care, . . . maintenance, and

education of the minor children of the parties" (sec. 247.24, Stats.), and to adjudge to the wife "such allowance for the support, maintenance, and education of the minor children committed to her care and custody as it shall deem just and reasonable." (Sec. 247.26, Stats.) Where a minor child is involved, particularly a very young one, the primary consideration is the welfare of the child; and it would ill accord with that policy to deny to the court all power to require the father to provide for the child in proper circumstances, in the event of his death.

We also consider it within the power of the divorce court in a proper case to require the father to secure the payments for the support of the minor child, by lien, trust, or other appropriate device. Sec. 247.30, Stats., provides that "In all cases where alimony or other *allowance shall be adjudged* to the wife or *for the maintenance or education of the children the* court may . . . impose the same as a charge upon any specific real estate of the party liable or *may require sufficient security to be given for the payment thereof, . . ."*

By authority of sec. 247.31, Stats.:

"The court may also appoint a trustee, when deemed expedient, to receive any money adjudged to the wife upon trust, to invest the same and pay over the income thereof for her maintenance or the maintenance and education of the minor children or any of them, or to pay over the principal sum in such proportions and at such times as the court shall direct. . . ."

The present case is a proper one in which to require the husband to give security for the support of the minor child if the trial court in its discretion thinks it best, since here the past conduct of the father in making a fraudulent conveyance of the major part of his assets to defeat his child's rights gives ground for suspicion that he may not take his obligation any more seriously in the future.

In *Dillon v. Dillon,* 244 Wis. 122, 11 N. W. (2d) 628, the court affirmed a judgment of divorce which required the hus-

band to assign to the clerk of the court the husband's income from a trust fund, and also distributions of corpus, to be held by the clerk in a trust capacity for making the husband's payment of alimony and support money for the children.

In *Beck v. First Nat. Bank in Oshkosh,* 244 Wis. 418, 12 N. W. (2d) 665, the court appointed a trustee to receive certain securities to provide for the support and education of the minor children of the parties. This court said (p. 425):

"The court had a right to order an assignment of the stocks in question as security for the support, maintenance, and education of these children. *Dillon v. Dillon,* ante, p. 122, 11 N. W. (2d) 628. The provision in the divorce judgment for the support of these minors could be revised at any time on petition of either of the parties, even though a trustee had been appointed. *Yates v. Yates* (1914), 157 Wis. 219, 147 N. W. 60. The obligation to support these children rested with the parents, and especially with the father, and the court is charged with the duty of seeing that this responsibility is carried out."

While this was done pursuant to stipulation in the *Beck Case,* this court's opinion points out that the stipulation was merged in the judgment and thereafter ceased to have contractual significance and was subject to modification regardless of the stipulation (pp. 426, 427).

Decisions in a number of other states have sustained the power of the divorce court to require that assets be placed in trust to secure payment of support money. Anno. 18 A. L. R. (2d) 1126, 1127, 1130; 2 Nelson, Divorce and Annulment (2d ed.), p. 100, sec. 14.91.

The trial court's disposition of the matter of security for the support of the child during his minority having been based on what we hold to have been a mistaken view of the law, we shall reverse the judgment in so far as it fails to provide for such security and absolves the doctor's property from liability therefor; and the cause will be remanded to the trial court for further consideration of those matters. We

intimate no opinion as to what, if any, action the court should take.

While the trial court expressed the opinion that it was without power to provide for the child's support beyond the father's lifetime, we do not interpret the judgment as an adjudication to that effect.

8. *Attorney's fees.* Plaintiff's attorney asked for an allowance of $7,330 for the services of himself and associate counsel, plus $849.68 disbursements, in addition to $500 already paid. The trial court ordered defendant to pay plaintiff's attorney $3,500 fees in addition to the $500, and $604.33 for disbursements. On motion for review, it is contended that the entire amount of the attorney's bill should have been allowed.

Since the wife was awarded over $65,000 as division of defendant's property, a generous allowance, it was well within the court's discretion to limit the allowance of attorney's fees and disbursements to $4,604.33, and leave it to the plaintiff to pay any balance to which her attorney may be entitled. *Roberts v. Roberts,* 253 Wis. 305, 310, 34 N. W. (2d) 130. Such limitation involves no necessary implication that the attorney's fees claimed were excessive or the disallowed disbursements unwarranted; and we do not understand that the trial court passed on their reasonableness.

*By the Court.*—On defendants' appeal the judgment is affirmed. On plaintiff's motion for review the judgment is reversed in so far as it awards the property of Hugh M. Caldwell, not otherwise disposed of, to him absolutely and fails to establish a trust or otherwise provide security for the support of the child, Curtis Caldwell, during his minority; and is affirmed in all other particulars. The cause is remanded to the trial court for further proceedings consistent with this opinion.

MARTIN, C. J., took no part.