GAROT, Appellant, v. GAROT, Respondent.

*April 27—June 2, 1964.*

For the appellant there was a brief by *Hanaway & Ross* of Green Bay, and oral argument by *Charles T. Hanaway*.

For the respondent there was a brief by *Evrard, Evrard, Duffy, Holman & Faulds* of Green Bay, and oral argument by *John P. Duffy.*

GORDON, J. Every marriage contains a romantic story, and every contested divorce portrays a tragic one. This particular saga is an especially melancholy tale. It had its origin with the marriage of Lawrence and Kathleen on August 19, 1939. At the time of the trial, Lawrence was fifty-two years of age and Kathleen was forty-six. No children were born to the marriage, but a boy, born in 1946, was adopted.

From the time of the marriage in 1939 until 1948, the parties appear to have been relatively happy as they progressed through this vale of tears. A cruel event occurred in 1948: Kathleen became afflicted with multiple sclerosis. By 1952 it had rendered her unable to walk. While the disease did not cause her actual pain or affect her mental capacity, it nevertheless required that she have almost constant care. She remained in that status to the date of trial.

At the onset of his wife's illness, Lawrence's earnings were barely sufficient to cover the cost of her care. Perhaps under the prod of that need, he intensified his business efforts and attained significant success in his insurance business. At the time of trial, he had business offices in six cities and did business in five states. Lawrence worked with 75 full-time agents of the company and traveled most of the week.

It was when he returned home on weekends that there occurred the abusive conduct on the part of Kathleen which prompted him to bring this action. Starting in about 1954, Kathleen would berate him when he arrived home for the weekend. She repeatedly accused him of having affairs with other women, not working, drinking, and carousing. Law-

rence testified that on the normal weekend when he would come home his wife would commence her verbal abuse by asking, "What pig have you slept with all week?" He also testified that these remarks were made by her in the presence of their son. The record contains references to several specific events in which Kathleen made abusive accusations of infidelity.

Although the son was not called to testify, Lawrence's testimony regarding his wife's accusations was well substantiated by Mrs. Coppens, who had worked in the Garot home as a housekeeper. She testified that Kathleen's interrogations of her husband were "not normal questions" and expressly confirmed the fact that they occurred at times in front of the boy.

It is significant, in our opinion, that Kathleen herself acknowledged charging her husband with associating with other women "on some occasions" but said she "didn't remember" doing it in front of the boy. She also admitted that her accusations were not based upon actual knowledge. When asked if she was suspicious of her husband, Kathleen responded: "Yes, I was. I have a very fiery temper. I would say things and immediately would be sorry and tell him so, but in the last few years he didn't accept an apology."

Accusations of a spouse's infidelity, drunkenness, and carousing cannot fairly be characterized as "trivial." In the case at bar, the accusations were open, repetitive, and groundless.

The record clearly establishes that commencing in 1954 Kathleen practiced a course of cruel and inhuman treatment upon her husband, within the meaning of sec. 247.07 (4), Stats. The record further establishes that her conduct affected Lawrence's health and made the marriage state intolerable. Lawrence's marital distress resulted in his incurring a physical malady which necessitated medical attention.

In our opinion, Lawrence was not obliged to tolerate indefinitely the abusive conduct of his wife. The record not only establishes the existence of that conduct, but further demonstrates that Lawrence himself was not guilty of any improper acts which would warrant invoking the doctrine of recrimination. *Mentzel v. Mentzel* (1958), 4 Wis. (2d) 584, 588, 91 N. W. (2d) 101; cf. *Bahr v. Bahr* (1956), 272 Wis. 323, 325, 75 N. W. (2d) 301.

In *Gordon v. Gordon* (1955), 270 Wis. 332, 340, 71 N. W. (2d) 386, this court said:

"However, treatment which does or is well calculated to impair the health of a party, makes the marriage state intolerable and renders a party incapable of performing his or her duties in married life, satisfies the 'cruel and inhuman treatment' referred to in the statute."

In *Mayhew v. Mayhew* (1942), 239 Wis. 489, 495–497, 1 N. W. (2d) 184, there are numerous quotations from earlier Wisconsin decisions which are also applicable. Even though Kathleen suffered from a crippling disease, it did not carry with it any mental disability; it is not a defense to her conduct toward her husband. See *Caldwell v. Caldwell* (1958), 5 Wis. (2d) 146, 154, 92 N. W. (2d) 356.

We conclude that the trial court's findings are against the great weight and clear preponderance of the evidence submitted. The trial court should have found that cruel and inhuman treatment of Lawrence by Kathleen was established, and, accordingly, it should have granted to him a divorce from the bonds of matrimony. Upon the return of the matter to the circuit court, that court should also resolve any questions which may arise as to property division, alimony, custody, visitation, or support.

*By the Court.*—Judgment reversed, and cause remanded with directions to grant a divorce to appellant.